**UNITED STATES of America,**
**Plaintiff,**

v.

**CNA FINANCIAL CORPORATION and the Continental Casualty Company d/b/a the Continental Insurance Company, Defendants.**

**No. A98–285 CV.**

United States District Court,
D. Alaska.

Sept. 4, 2001.

See also 2001 WL 1328978.

***ORDER FROM CHAMBERS***

SEDWICK, District Judge.

## I. PRELIMINARY ORDER

At docket 30, plaintiff United States of America moves for summary judgment. Defendants CNA Financial Corporation and the Continental Casualty Company d/b/a The Continental Insurance Company ("Continental") oppose the motion and cross-move for summary judgment at docket 31. Continental filed a timely request for oral argument.[1] The United States has filed an additional motion at docket 40 seeking to strike certain portions of Continental's briefing. Oral argu-

---

1. *See* Request for Oral Argument, docket 32.

ment is scheduled for September 11, 2001. The purpose of this preliminary order is to express the court's tentative views regarding all pending motions in the expectation that this will assist the parties prepare for oral argument. This preliminary order does not represent the court's final order, and does not authorize the filing of any additional or supplemental motion papers. The court may or may not adopt this preliminary order as its final order depending upon oral argument.

## II. BACKGROUND

### A. *Brief Statement of Case, Jurisdiction, and Parties*

This is an insurance coverage dispute. Defendant The Continental Insurance Company ("Continental") is a wholly-owned subsidiary of defendant CNA Financial Corporation ("CNA").[2] Although at some point Continental was apparently succeeded by CNA Healthpro, this order refers to "Continental" for simplicity's sake. Jurisdiction exists under 28 U.S.C. § 1345 conferring original jurisdiction on suits filed by the United States as a plaintiff.

### B. *General Facts* [3]

Pursuant to an agreement with the United States under the Indian Self–Determination and Education Assistance Act, Public Law 93–638 *codified at* 25 U.S.C. § 450 ("ISDEA"), Bristol Bay Area Health Corporation ("BBAHC") operated an alcohol abuse facility known as "Jake's Place" near Dillingham, Alaska.[4] The ISDEA (also sometimes referred to as Section 638) was enacted in 1975. ISDEA requires the Secretary of the Interior and the Secretary of Health and Human Services to execute self-determination contracts ceding control of programs previously administered by each respective Secretary to tribes or tribal organizations upon request from the tribe or tribal organization. As initially enacted, ISDEA obligated Indian tribes to secure adequate liability insurance as a precondition to executing any self-determination contract. Congress amended ISDEA in 1988 to shift responsibility for securing insurance from the tribes to the respective Secretaries. The reason for this shift was to prevent contract dollars from being spent on costly liability insurance. Congress further amended ISDEA in 1990 to provide that the Federal Tort Claims Act ("FTCA") covers negligence of tribal health center employees acting in the scope of employment based on the performance of self-determination contracts. Thus, any civil suit filed against a tribal health center operating under a Section 638 contract is deemed to be an action against the United States and covered by the FTCA.

BBAHC was insured by Continental under a commercial general liability policy numbered HMA 9500648–5 which covered

**2.** Defendant Continental Casualty Company is named in the complaint in a "doing business as" capacity as the Continental Insurance Company. However, it now seems undisputed that Continental Casualty Company is a separate corporate entity from Continental Insurance Company. "Continental" in this order refers to the Continental Insurance Company not the Continental Casualty Company.

**3.** The facts stated here are based on the motions, pleadings, and papers on file with the court. Citations are provided where necessary or appropriate. Because this is a prelim-

inary order, and for brevity's sake, the court has not provided citations to all facts. The parties should offer revisions or corrections at oral argument if they believe that the court has misconstrued or misstated any relevant fact.

**4.** The actual agreement has not been submitted by any party as an exhibit. The United States has filed extracts from the agreement, but offers no testimony, affidavit, or other form of admissible evidence to authenticate the extracts thus filed with the court.

BBAHC's medical operations. A separate policy, Policy 93 CBP 06114933–94, covered BBAHC's non-medical operations. Policy HMA 9500648–5 is the policy at issue in this case. It was in effect for a one year period beginning September 30, 1993. On November 27, 1993, Lori Wilson attended a dance and social function at Jake's Place. Blanche Kallstrom accidentally gave Wilson a glass of commercial strength dishwashing liquid to drink when Wilson asked for some juice. Wilson suffered serious internal injuries. Wilson filed suit against BBAHC in the Superior Court for the State of Alaska.

BBAHC tendered defense to Continental. Continental accepted defense and retained counsel for BBAHC. BBAHC's counsel moved to dismiss the suit from state court on the grounds that BBAHC's employees were deemed to be employees of the United States for purposes of tort liability under ISDEA, and consequently that the state court lacked jurisdiction. Wilson and the state court agreed. Wilson's state suit was dismissed without prejudice.

Wilson filed suit against the United States in this court.[5] The United States filed a third-party claim against Kallstrom. Kallstrom counterclaimed for negligent infliction of emotional distress. The United States tendered defense to Continental on January 6, 1995 referencing the wrong policy, Policy 93 CBP 06114933–94. BBAHC's counsel responded on February 13, 1995. Identifying himself as Continental's counsel, BBAHC's counsel rejected the tender.[6] BBAHC's counsel argued that the United States was not an additional insured under the insurance policy and that the policy included a premises exclusion barring coverage for the premises where the accident occurred.

The United States subsequently learned that BBAHC was covered under a second insurance policy (policy HMA 9500648–5). The United States therefore tendered defense to Continental again on June 6, 1995. This time, BBAHC's counsel advised that he was not authorized to respond on behalf of Continental, and that Continental would respond on its own. Continental did not respond. The United States wrote directly to Continental on September 13, 1995. Continental answered on October 3, 1995. Relying upon the grounds set forth in the February 13, 1995 letter, Continental rejected the tendered defense.

The United States tendered defense to CNA Healthpro, a successor to Continental, on February 20, 1997. The United States advised CNA that discovery was nearing a close. Thereafter, in May 1997, the United States notified CNA that a settlement with Wilson was pending. CNA rejected the tender of defense on June 19, 1997.

The United States settled all claims with Wilson on August 28, 1997 for $2.8 million. In February 1998, the United States secured summary judgment in its favor dismissing Kallstrom's counterclaim for negligent infliction of emotional distress. Kallstrom appealed to the Ninth Circuit. The case is still pending.[7] The United

---

**5.** *See Wilson v. United States,* A94–488 Civil (HRH).

**6.** There is some question concerning the ethical propriety of a lawyer retained for an insured also purporting to represent the insurer. *See Chi of Alaska, Inc. v. Employers Reinsurance Corp.,* 844 P.2d 1113 (Alaska 1993) (retained counsel owes insured full allegiance and must be independent from insurer).

**7.** The Ninth Circuit certified an issue to the Alaska Supreme Court on September 14, 1999. *See Wilson v. United States,* 190 F.3d 959, 962 (9th Cir.1999). According to the Alaska Appellate Courts Case Management System, a database maintained by the Alaska Supreme Court to track pending appeals, a

States filed this suit on August 14, 1998, and filed an amended complaint on October 26, 1998. The United States alleges five claims for denial of coverage, failure to defend, bad faith, breach of the implied covenant of good faith and fair dealing, and unfair claims settlement practices.

### C. Facts Pertaining to Contract Execution

The insurance policy at issue in this case, HMA 9500648–5, was effective from September 30, 1993 to September 30, 1994.[8] CNA's underwriter for this policy was Debra Patricia Wyatt–Brown ("Wyatt–Brown"). The insurance broker representing BBAHC was Lori Wing ("Wing").

Wing executed a declaration in November 1998 addressing the parties' intent and reasonable expectations.[9] In relevant part, Wing's declaration avers that, in securing CGL insurance from CNA, it was the parties' intent to fill in coverage gaps otherwise protected by the FTCA.[10] Wing further states that the parties never intended to include the United States as an additional insured.[11] Other BBAHC personnel have also testified during the course of this litigation that it was never BBAHC's intent to include the United States as an insured and that BBAHC's objective was to buy insurance for acts not

otherwise covered by the FTCA. Continental represents to the court that Robert Clark, BBAHC's President and Chief Executive Officer, testified that BBAHC secured insurance from CNA because it was not sure that the FTCA would cover everything.[12] However, as the United States notes, Clark also testified:

> See, we tried to get gap coverage and I think we couldn't ever get it, and I believe Lori was the one that was telling us that you just can't buy only this little bit only. You've got to buy all of it or none. And we don't know what the heck the FTCA covers, so we have to buy some coverage. So I think that the insurance should cover, and maybe should pay for the government. I don't know. Because it's not clear one way or the other. But I don't know.[13]

Continental's motion papers neglect to include these material statements. Liz Hartshorn, BBAHC's Chief Financial Officer, testified that BBAHC did not intend to buy insurance duplicating coverage under the FTCA.[14] Darrel Richardson, BBAHC's Chief Operations Officer, advised Wing that BBAHC wanted insurance to cover gaps in FTCA coverage. Wyatt–Brown testified that, when she underwrote the policy in question, it was her intent "to provide coverage for the general liability portion of the risk involving employees

---

draft opinion is now circulating among the Alaska Supreme Court justices. See http://www.appellate.courts.state.ak.us (Last visited August 29, 2001).

8. A digression is necessary to address a briefing problem. Beginning on page 3 of its motion at docket 31 and continuing on to and through the following page, Continental's motion includes multiple "Id." citations to the policy. It is by no means clear, however, to what source document Continental is referring.

9. See Declaration of Lori Wing, November 1, 1998 (submitted as Exh. B at docket 31).

10. See id., ¶¶ 4–9 at pp. 2–4.

11. See id.

12. See Deposition of Robert Clark, docket 31, Exh. P at p. 48, l. 20 to p. 49, l. 3.

13. See Deposition of Robert Clark, docket 41, Exh. 52 at p. 139, ll. 10–18. The citations provided by the United States at docket 41 erroneously identify the page as "138." See Reply, docket 41 at p. 4.

14. See Deposition of Liz Hartshorn, docket 31, Exh. R at p. 62, ll. 10–16.

while performing duties not in the capacity-as a federal employee." [15] Based on discussions with Wing, it was Wyatt–Brown's understanding that BBAHC "was covered under the Federal Tort Claims Act, and as a result, Continental would not be underwriting general liability coverage for all their general liability exposure." [16]

However, although BBAHC and Continental witnesses have testified in this litigation that it was the parties' intent to only provide coverage for gaps in FTCA coverage, there does not appear to be evidence of intent contemporaneous with purchase of the policy to establish this fact. In its motion papers, Continental frequently alludes to "contemporaneous written" documents supporting the testimony of BBAHC's or Continental's witnesses. But Continental either provides no citations to these "contemporaneous written" documents,[17] or provides citations to documents not in the record,[18] or cites to documents which, upon closer scrutiny, appear to be documents prepared for other parties or other entities.[19] The only document found by the court that comes close to objectively verifying the testimony of BBAHC's and Continental's respective witnesses is an August 6, 1992 letter sent to Liz Hartshorn from Lori Wing in which different potential insurance options are discussed.[20] But even this letter is ambiguous, and can be construed to undermine the subsequent testimony of BBAHC's and Continental's respective witnesses. In relevant part, Wing wrote:

> Just a follow up to our conversations and meetings the last few months regarding the Bristol Bay Area Health Corporation's (BBAHC) liability insurance program. Per your request we are exploring several alternatives for BBAHC to address the liability exposures that may not be considered part of the Federal Tort Claims Act (FTCA). The easiest solution, and one we are exploring, would be for BBAHC to purchase a professional liability insurance policy as it did prior to the inception of FTCA. While this would provide the broadest financial protection, it would most likely be the most expensive. We are also exploring the possibility of a policy that would provide indemnification and defense costs to BBAHC in the event that FTCA does not.[21]

This extract from the August 6, 1992 letter seems to suggest that BBAHC was likely to purchase the same insurance that existed prior to ISDEA amendments extending FTCA coverage.

Aside from the apparent failure of Continental to support its arguments, the United States identifies several relevant

15. *See* Deposition of Debra Wyatt–Brown, docket 31, Exh. O at p. 38, l. 15 to p. 39, l. 3.

16. *See id.* at p. 39, ll. 6–10.

17. *See, e.g.,* Continental's Motion, docket 31 at p. 2. Continental alludes to "contemporaneous written" documents, but provides no citation to these documents.

18. *See, e.g.,* Continental's Combined Opposition and Memorandum, docket 43 at p. 7. Continental cites a "December 23, 1992" letter purportedly sent from Lori Wing to prospective insurers as "Exhibit A, Exhibit O to Debra Wyatt–Brown deposition and related deposition testimony . . . ." *See* Docket 43 at p. 7. However, the referenced exhibit is not submitted with Continental's motion papers.

19. *See* Continental's Motion, docket 31 at p. 7. Continental cites a February 1991 legal memorandum "explaining 'the extent of the Federal Tort Claim Act' coverage of BBAHC liabilities." *Id.* However, the exhibit is addressed to "Navajo School Clients" and nowhere makes any reference to BBAHC. *See* Exh. L submitted with Deposition of Lori Wing, Exh. D at docket 31.

20. *See* Exh. N submitted with Deposition of Lori Wing, Exh. D at docket 31.

21. *See id.* at p. 1.

facts which seem to belie the testimony of BBAHC's and Continental's respective witnesses. Perhaps most significantly, Crystal Renee Brown, Continental's designated Rule 30(b)(6) witness, testified that Continental had a duty to defend (if not indemnify) the United States.[22] Moreover, the premium was determined by the square footage of the premises. Wyatt–Brown testified that the premium was never reduced because of the FTCA.[23] Continental represents to the court that "Continental's underwriters have testified that the premium paid by BBAHC *was* reduced on account of the FTCA coverage . . . ."[24] However, Continental provides no cite to support this assertion, and none appears in the record. Furthermore, the policy lists numerous exclusions, none of which excludes acts also covered by the FTCA. In addition, the policy contains no language indicating that the parties intended to provide coverage for risks related to activity which would not be covered by the FTCA.

No contemporaneous written documentation appears to confirm any intent to not cover acts also covered by the FTCA. This factor is particularly important. Wyatt–

Brown testified that she likely would have documented any intention to exclude acts also covered by the FTCA.[25] Notwithstanding this, Wyatt–Brown testified that she had not seen and was not aware of any documentation memorializing an intent to exclude coverage for acts falling under the FTCA.[26] The failure to expressly exclude coverage for claims covered by the FTCA or to otherwise specify the scope of intended coverage is particularly relevant in that Continental admits that it had a February 1991 memorandum from BBAHC's outside counsel, S. Bobo Dean, discussing the interplay between ISDEA and the FTCA.[27] In that memorandum, Dean wrote:

> If you do choose to maintain your private comprehensive general liability policy, we recommend that your policy expressly state that this coverage insures against claims falling *outside* the scope of FTCA coverage. This may assist your private insurance company in "quantifying" your degree of risk.[28]

Thus, consistent with Wyatt–Brown's testimony, one would have thought that she would have included a provision or exclu-

---

**22.** *See* Deposition of Crystal Renee Brown, docket 30, Exh. 45 at p. 77, ll. 19–22.

**23.** *See* Deposition of Debra Wyatt–Brown, docket 30, Exh. 17 at p. 176, ll. 18–20; *see also id.* at p. 149, ll. 19–23. Another digression is necessary. The United States' motion at docket 30 suffers from many of the same flaws that affect Continental's motion papers; specifically, confusing or erroneous citations. By way of example, at page 18, the United States drifts between discussing Wyatt–Brown's testimony filed at docket 17 and Wing's testimony discussed elsewhere, and includes multiple "Id." citations which are difficult to track.

**24.** *See* Continental's Opposition, docket 43 at p. 3.

**25.** *See* Deposition of Debra Wyatt–Brown, submitted at docket 30, Exh. 17 at p. 41, ll. 7–24.

**26.** *See id.* at p. 40, l. 6 to p. 41, l. 24.

**27.** *See* Continental's Opposition, docket 43 at p. 13. *See also supra,* note 19. Although Continental provides no specific citation to the source document, the context seems undeniably clear that it is referring to the 1991 Memorandum submitted by the United States as Exhibit 23 at docket 30. If this is not correct, Continental may notify the court at oral argument and clarify the discussion set forth in its motion papers at docket 43 on page 13. Absent such clarification, the court will conclude that the memorandum discussed at docket 43 on page 13 is, in fact, the 1991 Memorandum submitted by the United States as Exhibit 23 at docket 30.

**28.** *See* Docket 30, Exh. 23 at p. 4.

sion specifying that the policy did not cover acts or omissions covered by the FTCA if this was, in fact, the parties' intent.

Finally, premiums increased from approximately $13,000 in 1989 (when the FTCA did not cover acts of BBAHC's employees) to over $19,000 in 1993 (when the FTCA covered acts of BBAHC's employees). The United States points out that, if the parties actually intended to exclude acts covered by the FTCA or to only provide coverage for gaps where the FTCA did not apply, premiums should have been reduced not increased.

### D. *Summary of Legal Theories*

As noted, the United States amended complaint at docket 6 alleges claims for wrongful denial of coverage, failure to defend, bad faith, breach of the implied covenant of good faith and fair dealing, and unfair claims settlement practices. The United States' contract claims are based on three theories. First, the United States argues that it is entitled to implied indemnification from CNA. Second, the United States contends that it is an implied additional insured to the BBAHC policy issued by Continental. Third and finally, the United States contends that "it is a party to an indemnification agreement that is an insured agreement under the CNA contract with BBAHC."[29] For its part, Continental denies that the United States is an implied insured or entitled to implied indemnification. According to Continental, the policies it issued to BBAHC were only intended by the parties to cover gaps where BBAHC employees would not be deemed federal employees whose liability would be determined under the FTCA. Other facts and the court's analysis are found below.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[30] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[31] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[32] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[33] However, the nonmoving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[34]

### IV. DISCUSSION

#### A. *Whether the United States is entitled to Implied Insured Status*

█ Under Alaska law, courts may recognize an additional implied insured to an insurance policy if the risk to the insurer is not increased and the implied insured is within the class intended to be benefitted by the parties.[35] A brief review of rele-

29. *See* United States' Motion, docket 30 at p. 40.

30. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

31. *Id.* at 323–325, 106 S.Ct. 2548.

32. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–9, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

33. *Id.* at 255, 106 S.Ct. 2505.

34. *Id.* at 248–9, 106 S.Ct. 2505.

35. *See Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc.,* 682 P.2d 1108, 1113 (Alaska 1984).

vant Alaska case law is useful to summarize pertinent principles.

In *Alaska Insurance Co. v. RCA Alaska Communications, Inc.,*[36] the Alaska Supreme Court held that a commercial tenant was an implied co-insured of its landlord's fire insurance policy because a lease provision required the landlord to secure fire insurance.[37] The tenant's status as an implied co-insured defeated the insurer's subrogation claim even though the fire that destroyed the warehouse was allegedly caused by the negligence of the tenant's employees. Relying on a public policy rationale, the court reasoned that "it would contradict the reasonable expectations of a commercial tenant to allow the landlord's insurer to proceed against it after the landlord had contracted in the lease to provide fire insurance on the leased premises."[38] In *Olympic, Inc. v. Providence Washington Ins. Co. of Alaska,*[39] the court declined to extend the implied insurance doctrine to a landlord because the insurer "did not contractually agree to insure against risks attributable" to the landlord, and there was no evidence that the premium rates would not have varied had the landlord been added as an insured.[40]

*RCA Alaska* and *Olympic* led to *Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc.,*[41] where the court clarified its application of the implied insured doctrine by reference to third-party beneficiary con-

tract principles. In *Avi–Truck,* an aircraft crashed following takeoff from Anchorage International Airport and was rated a total loss.[42] The aircraft was insured by Stewart–Smith Haidinger ("Haidinger"). The insured was Trans–Northern Aleutian, Inc. ("TNA").[43] TNA leased the aircraft from Avi–Truck. The lease required TNA to secure hull insurance for $60,000.[44] Avi–Truck was not named in the insurance policy.[45] The bank that had loaned Avi–Truck money to buy the aircraft sued Avi–Truck to collect on the loan.[46] Avi–Truck filed a third-party complaint against the insurer and insurance brokers arguing that it was entitled to the proceeds of TNA's insurance policy.[47] Judge Singleton-then a state superior court judge and now Chief Judge of this District-held that Avi–Truck had standing to sue the insurer and brokers as a third-party beneficiary of TNA's insurance policy.[48] Judge Singleton determined that Avi–Truck enjoyed standing because it was within the class of persons intended to be benefitted by the policy-that is, the owners and operators of the aircraft-and the risk to the insurer was not affected by the technical question of who owned the aircraft.[49] Haidinger appealed, arguing that Avi–Truck could not be a third party beneficiary of the insurance contract because it was not named in the policy, Haidinger was not aware of Avi–Truck's existence until after the accident, and Avi–Truck did not even exist

**36.** 623 P.2d 1216 (Alaska 1981).

**37.** *Id.* at 1217.

**38.** *Id.* at 1219.

**39.** 648 P.2d 1008 (Alaska 1982).

**40.** *Id.* at 1014.

**41.** 682 P.2d 1108 (Alaska 1984).

**42.** *See id.* at 1110.

**43.** *See id.*

**44.** *See id.*

**45.** *See id.*

**46.** *See id.* at 1111.

**47.** *See id.*

**48.** *See id.* at 1111–12.

**49.** *See id.* at 1111.

when the insurance contract was initially negotiated.[50]

The Alaska Supreme Court rejected Haidinger's arguments and affirmed. The appellate court acknowledged that, in a strict technical sense, the insurance contract could not be deemed a third-party beneficiary contract.[51] Nevertheless, the court concluded that a third-party beneficiary contract could be implied at law.[52] This holding followed from two considerations. First, the insurer's risk was not altered by Avi–Truck's ownership of the aircraft.[53] Second, Avi–Truck was in the class of persons intended to be benefitted by the insurance policy.[54] This result was reached even though the policy did "not explicitly state that the insurance was to be obtained for the benefit of Avi–Truck,"[55] and despite the fact that Avi–Truck did not even exist when the policy was initially negotiated.[56]

 Based on the present record before the court, the court believes that the United States is probably entitled to summary judgment on its theory that it is an implied additional insured under BBAHC's insurance policy. It is true that several Continental and BBAHC witnesses testified that Continental and BBAHC only intended to buy insurance to fill in coverage gaps otherwise protected by the FTCA, and that the parties never intended to include the United States as an additional insured. However, subjective expectations of intent expressed during ongoing litigation are seldom, if ever, probative of the parties' reasonable expectations.[57]

Moreover, Continental's reliance on the subjective testimony of its witnesses obscures the correct legal analysis. The question is not necessarily whether BBAHC and Continental intended to include the United States, specifically, as an insured. Instead, the question is whether the United States is in the class intended to be benefitted. In this respect, as the United States correctly observes, an additional implied insured may be unknown to the parties or be an entity that was not even in existence when the insurance contract was formed.[58] It appears to the court that the United States was in the class intended to be benefitted. The purpose for the insurance policy was to provide commercial general liability coverage. BBAHC's employees were considered employees of the United States under IS-DEA. As amended in 1990, ISDEA provides that the FTCA covers negligence of tribal health center employees acting in the scope of employment based on the performance of self-determination contracts. Accordingly, civil suits filed against a tribal health center such as BBAHC operating under a Section 638 contract are deemed to be actions against the United States and covered by the FTCA. Continental must have known this in 1993 when issuing the policy to BBAHC.

Furthermore, Continental has not identified any independent, objectively verifiable evidence to support the subjective testimony of its witnesses. This failure is

**50.** See id. at 1112.

**51.** See id.

**52.** See id.

**53.** See id. at 1113.

**54.** See id.

**55.** See id.

**56.** See id. at 1112.

**57.** See Scully v. Scully, 987 P.2d 743, 748 n. 21 (Alaska 1999); Philbin v. Matanuska–Susitna Borough, 991 P.2d 1263, 1271 (Alaska 1999) (Carpeniti, J., dissenting).

**58.** See Stewart–Smith Haidinger, Inc. v. Avi–Truck, Inc., 682 P.2d 1108, 1112 (Alaska 1984).

puzzling because Continental frequently alludes to documentary evidence that purportedly supports the testimony of its witnesses. However, so far as the court can ascertain, no documents actually support Continental's assertions. It may be that documentation *does* exist somewhere in the record. But as previously discussed, Continental's briefing includes confusing and inaccurate citations which seemingly cannot be reconciled. It is not this court's responsibility to wade through all the deposition testimony and other exhibits submitted by the parties to find support for Continental's arguments.[59]

The court recognizes that, as Continental argues, the United States is not named as an insured anywhere in the policy. But this neglects to appreciate the theory relied upon by the United States. One would not expect an *additional implied* insured to be identified in a policy. Additionally, as the United States persuasively argues, several facts and circumstances lend support to the United States' arguments that it was, in fact and law, an additional implied insured. The premium was determined by the square footage of the premises. The premium was not reduced because of the FTCA. The policy lists numerous exclusions, none of which excludes acts also covered by the FTCA. The policy contains no language indicating that the parties intended to provide coverage for risks related to activity which would not be covered by the FTCA. No written documentation exists to confirm any intent to not cover acts also covered by the FTCA. Although the policy includes a provision addressing other primary insurance coverage, the policy does not identify FTCA coverage as primary or excess insurance coverage. Finally, premiums increased from approximately $13,000 in 1989 (when the FTCA did not cover acts of BBAHC's employees) to over $19,000 in 1993 (when the FTCA covered acts of BBAHC's employees). The United States points out that, if the parties actually intended to exclude acts covered by the FTCA or to only provide coverage for gaps where the FTCA did not apply, premiums should have been reduced during these years.

The court can find no evidence that the risk to Continental was or would be increased by including the United States as an additional implied insured. As noted, the premium was established without reference to FTCA liability. Furthermore, the United States was in the class intended to be benefitted by the parties. Therefore, based on the record presently before the court, it seems probable that the United States is entitled to partial summary judgment or summary judgment on its theory that it was an additional implied insured under BBAHC's policy with Continental.

**B. *Interim Transition***

Based on the preceding, it is not necessary for the court to reach any other issue. However, additional analysis is useful in case Continental persuades the court that its preliminary conclusion regarding the United States' status as an additional implied insured is incorrect.

**C. *Whether an Indemnification Agreement executed between the United States and BBAHC is covered as an Insured Contract under BBAHC's Policy***

The self-determination contract executed between BBAHC and the United States included an Indemnity and Insurance Clause, incorporated by reference, which required BBAHC to indemnify and hold harmless the United States:

---

59. *See Carmen v. San Francisco Unified School Dist.,* 237 F.3d 1026, 1028–31(9th Cir. 2001); *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir.1996).

(a) The Contractor shall indemnify and save and keep harmless the Government against any or all loss, cost, damage, claim, expense or liability whatsoever because of accident or injury to persons or property or others occurring in connection with any program included as a part of this contract, by providing where applicable, the insurance described below:

(b) The Contractor shall secure, pay the premium for, and keep in force until the expiration of this contract, or any renewal period thereof, insurance as provided below. Such insurance policies shall specifically include a provision stating the liability assumed by the Contractor under this contract.

(1) Workman's compensation insurance as required by laws of the state.

(2) Owner's [,] landlord's, and tenant's bodily injury liability insurance with limits or [sic] not less than $50,000 for each person $500,000 for each accident.[60]

The policy at issue in this case excludes coverage for bodily injury or property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."[61] However:

This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

(2) That the insured would have in the absence of the contract or agreement.[62]

The policy defines "insured contract" as meaning, in part:

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.[63]

Based on these provisions, the United States argues that BBAHC's policy covers indemnification agreements of the sort executed between the United States and BBAHC. Continental raises numerous arguments attempting to undermine or rebut the United States' position.

Unfortunately, the United States has not adequately addressed the factual basis or bases concerning self-determination contracts between it and BBAHC. Consequently, the court cannot properly evaluate the United States' argument because no one has addressed the underlying Section 638 self-determination contract upon which the United States' argument is based.

The First Amended Complaint alleges, in relevant part, that "BBAHC operated Jake's Place under an agreement with the United States of America, pursuant to the Indian Self–Determination and Education Assistance Act, 25 U.S.C. § 450."[64] How-

---

**60.** *See* Self–Determination Contract, General Provisions, Clause 19 (submitted at docket 30, Exh. 50 at pp. 4–5). For .contract between BBAHC and the United States incorporating Clause 19 and other general provision clauses, *see* Contract, (submitted at docket 30, Exh. 49 at p. 2).

**61.** *See* Policy (submitted at docket 30, Exh. 18 at p. 11).

**62.** *See id.*

**63.** *See* Policy (submitted at docket 30, Exh. 18 at p. 20).

**64.** *See* First Amended Complaint, docket 6, ¶ 9 at p. 3.

ever, the agreement has not been carefully addressed by the United States. The exhibits submitted as Exhibits 49 and 50 at docket 30 are purportedly extracts from the agreement. But the exhibits have not been authenticated as representing the contract executed by BBAHC or representing any part of that contract.

As noted above, it is not the court's responsibility to sift through all the deposition testimony and other exhibits submitted by the parties to find support for a party's arguments. Instead, as the moving party, it is incumbent upon the United States to support its motion with exhibits appropriately cited, to establish that there are no genuine issues of material fact in dispute, and to establish that it is entitled to summary judgment as a matter of law. The United States has failed to meet its burden. The general thrust of the United States' argument *seems* plausible. Indeed, stated as a general proposition, it is undisputed that BBAHC and the United States executed an agreement or contract governed by ISDEA at some point, and that this agreement or contract addressed operation of Jake's Place. However, there are insufficient specific facts on the record before the court to permit the court to reach the conclusions urged by the United States. The court cannot simply assume facts in favor of either party.

Therefore, based solely on the inadequately developed record presently before the court, the United States is not entitled to summary judgment or partial summary judgment on the theory that the United States "is a party to an indemnification agreement that is an insured agreement

under the CNA contract with BBAHC." [65] The court expresses no opinion regarding the arguments raised by Continental. However, the court agrees with Continental that it seems questionable whether the contract provision relied upon by the United States could withstand scrutiny on public policy grounds in light of the 1988 amendment to ISDEA shifting responsibility for securing insurance to the government from tribal organizations executing Section 638 contracts. The court is also concerned that it might lack jurisdiction to consider arguments implicating federal contract disputes.[66] As these issues have not been adequately identified or briefed by the parties, the court defers further comment. However, its observations are intended to assist the parties should it become necessary to re-visit this particular argument in subsequent motion practice.

**D. *Whether the United States is entitled to Implied Indemnification***

The United States argues in the alternative that it is entitled to implied indemnification. Under Alaska law, an implied indemnity claim is composed of three elements: (1) the claimant discharges a legal obligation to a third party; (2) the defendant is also liable to the same third party for the same injury; and (3) as between the claimant and the defendant, the obligation should be discharged by the defendant.[67] In addition to these elements, Alaska requires the existence of a contractual relationship or other duty between the plaintiff and defendant to justify imposition of liability based on implied indemnity.[68]

In *Ritchie v. United States*,[69] plaintiffs

---

65. *See* United States' Motion, docket 30 at p. 40.

66. Under the Contract Disputes Act, 41 U.S.C. §§ 605 *et seq.*, jurisdiction over contract disputes is vested with the United States Court of Federal Claims.

67. *See Providence Washington Ins. Co. v. De-Havilland Aircraft Co. of Canada, Ltd.*, 699 P.2d 355, 357 (Alaska 1985).

68. *See id.*

69. 732 F.Supp. 1125 (W.D.Okla.1990).

sued the United States for medical malpractice committed by Dr. Ram Singh while performing a hysterectomy.[70] The court initially held that Dr. Singh was an employee of the United States for purposes of the FTCA. The United States then filed a third party complaint against Dr. Singh's medical malpractice insurance carrier, Physician's Liability Insurance Company ("PLICO"). Arguing that it could not be liable to the United States absent a contract of some sort, PLICO moved to dismiss the third party complaint. The court rejected PLICO's arguments and held that the United States could assert a claim for implied indemnity against PLICO. The court noted that Dr. Singh's alleged malpractice formed the basis of the claim asserted against the United States.[71] The court observed that PLICO insured Dr. Singh for his entire medical practice, including those acts or omissions arising from Dr. Singh's work for the government.[72] PLICO accepted full premiums and made no attempt to exclude acts or omissions carried out for the government.[73] PLICO could have easily excluded coverage for acts or omissions related to Dr. Singh's work for the government, but it did not do so. Thus, PLICO stood to gain an undeserved windfall by accepting a full premium, but not covering the negligent acts of its insured. Under these circumstances, the court concluded that the United States could assert a claim for implied indemnity against Dr. Singh's insurer.

In general, the court agrees with the United States that *Ritchie* is essentially indistinguishable from this case. Continental's attempts to distinguish *Ritchie* are not particularly availing. The court's only hesitation in granting summary judgment to the United States on this particular theory is that, under Alaska law, the substance of the *Ritchie* court's actual analysis seems to fit more appropriately within an implied additional insured theory than an implied indemnity theory. Furthermore, it does not seem to be necessary to reach this issue given the court's ruling concerning the United States' status as an additional implied insured. However, if Continental persuades the court that the United States should not be considered an additional implied insured, the court would be inclined to grant the United States summary judgment on its theory that it is entitled to implied indemnity. Accordingly, Continental should be prepared to address both theories at oral argument.

### E. *Does Bad Faith Exist?*

 To establish a claim for bad faith denial of coverage, a plaintiff must show that the defendant-insurer lacked a reasonable basis for denying benefits of the policy and that the defendant-insurer had knowledge that no reasonable basis existed to deny the claim or acted in reckless disregard for the lack of a reasonable basis for denying the claim.[74] A review of certain facts is necessary to properly evaluate the United States' bad faith claim.

 The United States first tendered Wilson's claims to Continental on January 6, 1995.[75] Citing case authorities, the United States briefly summarized its position that it was covered under the policy.[76] Continental had already retained James B. Friderici of the law firm of Delaney, Wiles

---

**70.** *See id.* at 1126.

**71.** *See id.* at 1127.

**72.** *See id.*

**73.** *See id.*

**74.** *See Hillman v. Nationwide Mut. Fire Ins. Co.,* 855 P.2d 1321, 1324 (Alaska 1993).

**75.** *See* First Amended Complaint, docket 6, Exh. 2.

**76.** *See id.*

*et al.* to represent BBAHC. As retained counsel for BBAHC, Friderici owed BBAHC his full and undivided loyalty and allegiance. There is some question concerning the ethical propriety of Friderici's responding on behalf of the insurer, Continental, when he represented the insured, BBAHC.[77] Notwithstanding ethical precepts, Friderici authored a February 13, 1995 letter on behalf of Continental in which he rejected the United States' tender.[78] Friderici rejected tender primarily because the specific policy referenced and relied upon by the United States excluded acts arising on the premises of the Alcohol Transition Center ("Jake's Place"). Friderici neither cited nor discussed any relevant case law. Friderici and Continental did not advise the United States that there was a separate policy covering Jake's Place.

Exhibit 51 submitted at docket 30 establishes that, as of June 1, 1995, over three months after Friderici's February 13, 1995 letter authored on Continental's behalf, BBAHC's counsel had "not yet formed a final opinion whether the United States is an insured person under the applicable general liability policy."[79] In that letter, BBAHC's counsel, Mr. Stewart, rejected any contrary conclusion held by Friderici and advised him that "If either you or Continental had been relying on any verbal statements I may have made ..., it would have been prudent to confirm your understandings in writing."[80] Thus, it appears that Friderici (BBAHC's litigation counsel) rejected tender even though his client (BBAHC) had not reached any conclusion regarding whether the United States was an implied insured under its policy.

On June 6, 1995, after discovering the existence of the second policy covering Jake's Place, the United States again tendered defense to Continental.[81] The United States set forth its position in a carefully crafted and well-supported letter citing both treatises and case law. Friderici answered this second tender on June 8, 1995 advising that he was not authorized to respond, but that he would forward the tender to Continental.[82] Friderici represented that "someone on behalf of Continental will respond to your tender."[83] However, no one ever did.

After three additional months passed, the United States wrote directly to Continental and submitted copies of all correspondence pertaining to its tenders.[84] Continental responded on October 3, 1995 by again rejecting tender.[85] In doing so, Continental expressly relied upon Friderici's February 13, 1995 rejection letter despite the fact that the February 1995 letter did not address the applicable policy.[86] Continental made no attempt to discuss or distinguish the legal authorities cited in the United States' correspondence.

Sixteen more months passed during which the United States reached a point

---

77. *See Chi of Alaska, Inc. v. Employers Reinsurance Corp.*, 844 P.2d 1113 (Alaska 1993) (retained counsel owes insured full allegiance and must be independent from insurer).

78. *See* First Amended Complaint, docket 6, Exh. 4 at p. 1.

79. *See* Exh. 51 at p. 1 (submitted at docket 30).

80. *See* First Amended Complaint, docket 6, Exh. 4.

81. *See id.*, Exh. 5.

82. *See id.*, Exh. 6.

83. *See id.*

84. *See id.*, Exh. 7.

85. *See id.*, Exh. 8.

86. *See id.*

where it was engaging in final settlement negotiations with Wilson. On February 20, 1997, the United States wrote CNA Healthpro, Continental's successor corporation, and again tendered Wilson's claim for a third time.[87] The United States set forth all relevant facts, including the procedural history related to Wilson's lawsuit, and again discussed in considerable detail the legal principles supporting tender. On March 18, 1997, CNA acknowledged receipt of the United States' third tender, and promised to respond.[88] No further word was heard. On May 16, 1997, the United States contacted CNA and notified it that it had received a settlement demand from Wilson's counsel.[89]

CNA retained Craig Stowers of the law firm of Clapp, Peterson and Stowers to respond to the United States' tender. Stowers rejected tender in a June 19, 1997 letter.[90] Stowers advised the United States, "It is our opinion that neither of the two referenced general liability insurance policies create in CNA a duty to defend or indemnify the United States in this case."[91] It is unclear how this conclusion was reached given that Continental's own 30(b)(6) witness later testified that Continental *did* have a duty to defend even if it did not have a duty to indemnify. Stowers advised the United States that "[f]rom our factual investigation, ... the two Continental policies were purchased to provide protection from liability in cases where the United States (or a court) might determine that the liability was not covered by the F.T.C.A."[92] Based on what has been presented to the court, it appears that either Continental personnel misrepresented the circumstances to Stowers or Stowers, acting on Continental's behalf, conducted an inadequate investigation. For example, Stowers also stated that "[w]e have been informed that the premiums charged for the policies were relatively small, reflecting the relatively small risk being insured against."[93] Yet, the undisputed factual record developed during this case shows that the premiums were based on square footage, increased over the course of years, and were never reduced in light of any consideration related to FTCA coverage.

The court does not intend its remarks to impugn the professionalism of either Mr. Friderici or Mr. Stowers, both lawyers who enjoy good reputations in this legal community. The court understands that hindsight is $^{20}\!/_{20}$, and that neither Friderici nor Stowers had the benefit of the factual record developed in this case. However, the court's task in analyzing the United States' bad faith claim is to ascertain whether Continental had a reasonable basis to deny the United States' multiple tenders. The relevant point is that, based on the record in this case, the United States' tenders were not reasonably evaluated by Continental either on the facts or relevant legal principles.

In review, to establish a bad faith claim, a plaintiff must show that the defendant-insurer lacked a reasonable basis for denying coverage and that the defendant-insurer had knowledge that no reasonable basis existed to deny the claim or acted in reckless disregard for the lack of a reasonable basis for denying the claim.[94] Based on

---

87. *See id.,* Exh. 9.

88. *See id.,* Exh. 10.

89. *See id.,* Exh. 11.

90. *See id.,* Exh. 12.

91. *See id.* at p. 2.

92. *See id.*

93. *See id.*

94. *See Hillman v. Nationwide Mut. Fire Ins. Co.,* 855 P.2d 1321, 1324 (Alaska 1993).

the circumstances described above, this court believes that the United States may be entitled to summary judgment on the bad faith claim.

## V. CONCLUSION

For the foregoing reasons, it seems probable to the court that:

(1) The United States' motion at docket 30 should be granted based on the grounds that the United States was an additional implied insured under BBAHC's policy with Continental;

(2) CNA's motion at docket 31 should probably be denied; and

(3) The United States' motion at docket 40 should probably be denied as moot.

This preliminary order does not represent the court's final order, and does not authorize the filing of any additional or supplemental motion papers. The court may or may not adopt this preliminary order as its final order depending upon oral argument. Assuming that the court adopts this order as its final order at the conclusion of oral argument, the parties should be prepared to discuss a briefing schedule or scheduling order for purposes of damages.